IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| BOBBY JOE STONE, and ) | |
| TINA STONE BALLENTINE ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CV 1:12-3777-RBP |
| ) | |
| KOCH FARMS OF GADSDEN, LLC. ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This cause comes before the court on defendant Koch Farms of Gadsden, LLC's ("Koch") Motion for Summary Judgment. Subsequently, the plaintiffs, Bobby Joe Stone and Tina Stone Ballentine, filed a Motion to Strike certain exhibits attached to the Motion for Summary Judgment. The defendant then filed a Motion to Strike portions of Mr. Stone's declaration attached to the plaintiffs' opposition to the Motion for Summary Judgment.

**I. Facts[1]**

The plaintiffs owned and operated a chicken farm, Stone Farm, during the relevant time periods. Stone Farm and Koch signed a Poultry Production Agreement ("the Contract") whereby Stone Farm would house and care for flocks of chickens provided by Koch. The Contract provided certain standards and regulations that the producers were required to meet. If these standards were not met, Koch would issue a Notice of Deficiency. These notices would classify the deficiency as critical, major or minor. Upon issuance of a critical deficiency, a producer is admitted to the Producer Improvement Program (the "PIP"). Once in the PIP, the contract will

---

[1] As considered under summary judgment rules. *See infra*.

1

be terminated if a producer receives three Notices of Deficiency in the first 180 days or, if the PIP is extended an extra 180 days, one Notice of Deficiency in the second 180 days.

Stone Farm received a critical Notice of Deficiency and was admitted to the PIP. During the first 180 days, they received two additional Notices of Deficiency and the PIP was extended an additional 180 days. During the second 180 days, Stone Farm received additional Notices of Deficiency. As a result, Koch informed the plaintiffs on August 16, 2010 that they would not receive any additional flocks after November 16, 2010.[2]

Later, an incident occurred between Koch employees and John Stone, a relative of the plaintiffs, at Stone Farm. As a result, Koch informed the plaintiffs that they would cease providing flocks to Stone Farm immediately. Subsequently, the plaintiffs and Koch representatives held a meeting on October 7, 2010 at which the plaintiffs assured Koch that no further incidents would occur. As a result, Koch decided it would continue placing flocks at Stone Farm during the 90 day waiting period. However, Koch did not place any additional flocks at Stone Farm after the meeting.

## II. Legal Standard

**A. Motion to Strike**

District courts "ha[ve] broad discretion in considering a motion to strike." *Tracfone Wireless, Inc. v. Access Telecom, Inc.*, 642 F. Supp. 2d 1354, 1360 (S.D. Fla. 2009). "[T]he general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (footnote omitted) (citation omitted); *see also Morris v. Precoat Metals*, 2:11-CV-0053-SLB, 2013 WL 830868, at

---

[2] Koch gave the plaintiffs 90 days before termination of the contract so that they could make other arrangements with another company.

*2 (N.D. Ala. Mar. 4, 2013) ("[M]otions to strike evidence may be granted where the evidence that is offered is inadmissible under the Federal Rules of Evidence."). However, the court "may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial.'" *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (citations omitted); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

**B. Motion for Summary Judgment**

Summary judgment is appropriate when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the [depositions and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23.

Once the moving party meets this burden, the burden then shifts to the nonmoving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In responding to a motion for

summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a *genuine issue for trial*." *Celotex*, 477 U.S. at 324 (internal quotations omitted) (emphasis added).  The nonmoving party need not present evidence in a form admissible at trial; "however, he may not merely rest on [the] pleadings." *Id*.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  "Even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements

create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Graham*, 193 F.3d at 1282. The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the nonmoving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

### III. Discussion

**A. Plaintiff's Motion to Strike**

The plaintiffs move to strike attachments to the defendant's Motion for Summary Judgment, Exhibits 5A-J and 6A-C,[3] arguing that they are inadmissible under the Federal Rules of Evidence. The court disagrees.

<u>1. Authenticity</u>

Describing authentication, the Eleventh Circuit stated:

> Authentication or identification under [R]ule 901 merely involves the process of presenting sufficient evidence to make out a *prima facie* case that the proffered evidence is what it purports to be. Once that *prima facie* showing has been made, the evidence should be admitted, although it remains for the trier of fact to appraise whether the proffered evidence is in fact what it purports to be.

---

[3] Exhibits 5I-J contain information regarding the incident between Koch employees and John Stone. The details of the incident are irrelevant to the court's decision. Exhibits 6B-C are letters from Koch to the plaintiffs regarding the aftermath of this incident. However, the plaintiffs cite them in their additional facts and argument that Koch was required to provide an additional flock. (Doc. 21 pp. 6, 15). They also appear to contend that Exhibit 6C constituted an offer. (Doc. 21 p. 15).

*United States v. Caldwell*, 776 F.2d 989, 1001-02 (11th Cir. 1985). Rule 901 lists "[t]estimony that an item is what it is claimed to be" as an example of how to authenticate an item of evidence. Fed. R. Evid. 901. The plaintiff only challenges the authenticity of a letter from Mr. Dion Rainwater to Stone Farm. In his declaration, Mr. Rainwater states that the letter is a "true and accurate copy." (Doc. 17-5 ¶ 7). Furthermore, Mr. Stone testified he received the letter. (Doc. 17-3 pp. 46:21-47:5). Thus, the letter has been properly authenticated.

     2. Business Record Exception

Next, the plaintiff argues that the attached exhibits are inadmissible hearsay because they do not meet the requirements of Rule 803(6). Rule 803(6) requires the business record to meet the following requirements:

    (A) [T]he record was made at or near the time by--or from information transmitted by--someone with knowledge;

    (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

    (C) making the record was a regular practice of that activity;

    (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

    (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6). "The touchstone of admissibility under the business records exception to the hearsay rule is reliability, and a trial judge has broad discretion to determine the admissibility of such evidence." *United States v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996) (citations omitted).

*a. PIP Letters*

The plaintiffs first challenge two letters from Mr. Rainwater, Exhibits 5A and 5D, placing Stone farms in the PIP and extending the PIP for an additional 180 days, respectively. (Doc. 20 p. 2). They contend that Mr. Rainwater's declaration does not establish that he had knowledge of "the record keeping practices of Koch." *Id*. Mr. Rainwater's declaration sufficiently establishes his knowledge of the defendant's record keeping practice. He was the Broiler Manager for Koch Farms during the relevant time period, and he defined the PIP and described its relationship with the underlying contract in his declaration. (*Id*. ¶¶ 1-16). The contractual documents also establish that the PIP was a regularly conducted activity of Koch, (doc. 17-4 Attachment 2 pp. 2-9), and provided for notification in writing for entry into the PIP, (*id*. at 8).

Furthermore, the surrounding circumstances demonstrate the letters' "reliability." *Bueno-Sierra*, 99 F.3d at 378. The plaintiffs admitted that "Stone Farm's participation in the PIP program was extended for a second 180 day period," (doc. 17, 21 ¶ 26), and Mr. Stone identified both the letters in his deposition, (doc. 17-3 pp. 13:3-7, 53:4-9). Thus, the letters may be considered with the motion for summary judgment.

*b. Notices of Deficiency*

The plaintiffs next challenge the admissibility of the Notices of Deficiency in Exhibits 5B-C and 5E-H. Without explanation, they aver that Mr. Rainwater's declaration does not establish that they are business records. The court disagrees. Mr. Rainwater's declaration, (doc. 17-5 ¶¶ 3-16), and the PIP document, (doc. 17-4 Attachment 2 p. 6), demonstrate that issuing such notices was a regular practice of the defendant's business.

And again, the circumstances indicate the "reliability" of the notices.  First, the plaintiffs have admitted most of the underlying deficiencies described in the notices.  *See* (doc. 17, 21. at ¶ 28) (excessively high ammonia levels, failing to chart the water and tripping the electric fans' breakers); (*id*. at ¶ 35) (admitting that the curtain drop[4] and alarms were not working).  Mr. Stone also acknowledged the cost deficiency reported in April 2010, (doc. 17-3 pp. 60:23-61:20), and discussed the events that led to the notice for insufficient help, (*id*. at pp. 63:19-69:5).  In fact, in some cases, he specifically recounted receiving the notice.  *See* (*id*. at 53:10-13; 60:23-61:20).

### c. Termination Letter from Harold Hunt

The plaintiffs argue that the termination letter, Exhibit 6A, from Harold Hunt to the plaintiffs is inadmissible.  The letter provided that contract would be terminated in 90 days.  They contend that Mr. Hunt's declaration does not establish that he is familiar with Koch's record keeping practices or that the letter was kept in the ordinary course of business.  Mr. Hunt was the Complex Manager for Koch during the relevant time period, and he stated that Koch terminated the contract because of the notices received during the second 180 days of the PIP.  (Doc. 17-6 ¶¶ 2-3).  The contract and the PIP document provide for written notice of termination in a variety of circumstances.  *See* (doc. 17-4 pp. 9-11); (doc. 17-4 Attachment 2 p. 8).  While the PIP document does not specifically provide for written notice of termination after a deficiency notice in the second 180 days of the PIP, the other evidence indicates that written notice was a regularly conducted activity in the normal course of business.  *See United States v. Hawkins*, 905 F.2d 1489, 1494-95 (11th Cir. 1990) ("There is ample circumstantial evidence in the instant case supporting the trustworthiness of the notations, and that they were in fact made in the regular course of … business.").

---

[4] The curtain drop is a device to either let air into or to keep air out of the chicken house.  (Doc. 17-3 pp. 71-72).

Furthermore, the circumstances also demonstrate the letter's reliability. The plaintiffs admitted the contents of the letter; they admitted that "Stone Farm was given ninety days' advance written notice so that it could make arrangements to obtain chickens from another company before the termination became effective." (Doc. 17, 21 ¶ 37). Additionally, Mr. Stone remembered receiving the termination letter. (Doc. 17-3 pp. 12:8-3:15).

The plaintiffs' admissions, the deposition of Mr. Stone, the Exhibits' supporting declarations, and the other evidence in the record demonstrate that these exhibits can be considered in deciding the defendant's motion for summary judgment.

**B. Motion for Summary Judgment**

The necessary elements of a breach of contract claim "are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." *Reynolds Metals Co. v. Hill*, 825 So. 2d 100, 105-06 (Ala. 2002) (citation omitted). In the present case, the plaintiffs have not produced evidence demonstrating "the defendant's nonperformance." *Id*.[5]

The plaintiffs argue that although "the contract was on a flock to flock basis, the contract still required [Koch] to provide flocks absent circumstances that would suggest discontinuance of the contract was warranted." (Doc. 21 p. 14).[6] This requirement supposedly stems from the implied covenant of good faith and fair dealing. *See Chavers v. Nat'l Sec. Fire & Cas. Co.*, 405

---

[5] Koch also contends that the plaintiffs could not perform under the contract and did not suffer recoverable damages. They further argue that Mr. Stone lacks standing to bring a contract claim. However, the court need not address these arguments.

[6] Without argument or legal support, the plaintiff also comments that ("[a]n at-will termination [clause] defeats the very purpose of a written contract and should be void as against public policy." (Doc. 21 p. 15)). However, Alabama law allows indefinite duration contracts in both sales and employment law. *See* Ala. Code § 7-2-309(2) ("Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party."); *Hoffman-La Roche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987) ("[T]he rule is well settled in Alabama that an employee contract at will may be terminated by either party with or without cause or justification."). Furthermore, finding the duration provision void would not change the court's conclusion.

So. 2d 1, 4 (Ala. 1981) ("Every contract contains an implied in law covenant of good faith and fair dealing; this covenant provides that neither party will interfere with the rights of the other to receive the benefits of the agreement.").

Assuming *arguendo* that Koch could only terminate the contract with cause, the court finds that Koch did have cause to terminate the contract. The contract provides for termination of the contract if a producer receives a Notice of Deficiency during the second 180 day period of the PIP. (Doc. 17, 21 ¶ 18); (doc. 17-4 Attachment 2 p. 8). Stone farms received four such notices during the second 180 day period. (Doc. 17-5 ¶¶ 11, 15, 16). The contract also contains an express provision that providing that a delay in termination does not constitute a waiver. (Doc. 17, 21 ¶ 19); (doc. 17-4 p. 11). The plaintiffs admit that in April 2010 "there were enough deficiencies for Koch to have terminated the contract." (Doc. 17, 21 ¶ 29). The plaintiffs aver that these were only minor deficiencies and that they produced sufficient amounts of satisfactory chickens.[7] They state "that during the PIP [], additional deficiencies were noted; however, Stone Farm was still producing acceptable chickens." (Doc. 21 p. 13). However, the contract provides for termination based on the number of deficiency notices issued during the PIP – not the acceptability of the chickens.

The plaintiffs also argue that Koch had a duty to provide an additional flock(s) before the effective termination date, November 16, 2010. The plaintiffs contend that this obligation also arises from the implied covenant of good faith and fair dealing. Additionally, they argue that Koch expressly agreed to provide an additional flock before termination. Assuming Koch was

---

[7] In their brief, the plaintiffs state that the deficiencies were explained and that Koch ended the contract because of the threats allegedly made by John Stone. However, the contract was terminated before this incident occurred. (Doc. 17-6 ¶¶ 3, 5).

required to provide an additional flock(s) during this period, Koch did not breach this obligation.

Mr. Rainwater stated as follows:

> After the October 7, 2010 meeting with Mrs. Ballentine and Mr. Stone to discuss the threats, and before the contract termination date, I called Mr. Stone two different times to ask if Stone Farm wanted to receive another flock before the effective date of the Stone Farm Contract termination.
>
> In response to my first phone call, Mr. Stone told me that the farm could not accept any chickens because he had burned his legs with grease and could not care for the birds.
>
> In Response to my second phone call, Mr. Stone told me that the farm was unable to accept any more flocks because the gas to the farm had been cut off and there was no way to heat the chicken houses.
>
> Mr. Stone never followed up or requested any additional flocks, and my second phone call with him was the last communication either Mrs. Ballentine or Mr. Stone had with anyone at Koch.

(Doc. 17-5 ¶¶ 19-22).  The plaintiffs admitted these facts in their response.  (Doc. 17, 21 ¶¶ 46-49).  In his deposition, Mr. Stone confirmed that he could not initially take the flocks because of a grease burn, (doc. 17-3 pp. 76:6-78:7), and that he was unable to take flocks on November 9, 2010 because of non-payment of his gas bill, (*id*. at 78:12-23).

> In his subsequent affidavit, Mr. Stone attempted to walk back these admissions:
>
> While I could not immediately take more flocks because of a temporary medical condition, I told Koch, verbally, that I wanted to take more flocks, and that I could take the flock the following week.
>
> I could have also, as I had in the past, gotten help in receiving and caring for the flocks while I recovered from my medical condition.
>
> I also would have, had Koch been willing to provide the flock, found a way to turn the gas back on.

(Doc. 21-1 ¶¶ 15-17).  First, his ability to care for a flock despite his medical condition – with or without help – is irrelevant.  He admitted, in both his deposition and affidavit, that <u>he rejected</u> Koch's initial attempt to provide Stone Farm with a flock.

11

Next, his assertion that he would find a way to turn on the gas if Koch had been willing to provide a flock directly contradicts his previous statement, pertinent part as follows:

> Q. Do you remember him [Mr. Rainwater] calling you on November 9th, 2010? Do you remember telling him that you would not be able to take the chicks back due to the fact that you were behind on the gas bill to the point –
>
> A. Yes., They cut my gas off.
>
> Q. <u>So you didn't have any way to heat the houses at that time?</u>
>
> A. <u>No</u>.
>
> Q. <u>So you were unable to take any chicks?</u>
>
> A. <u>I was unable to at that time, yes</u>, because they had cut the gas off.

(Doc. 17-3 p. 78:12-23) (emphasis added).  It also directly contradicts the undisputed facts that "he was unable to take any more flocks because his gas had been cut off" and that he "never followed up or requested any additional flocks."  (Doc. 17, 21 ¶¶ 48,49).  The allegations in the affidavit should be disregarded as a sham.  *See Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("An affidavit may only be disregarded as a sham when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.") (internal quotations and citation omitted).

Koch made two separate attempts to provide additional flocks to the plaintiffs before the contract termination date.  Both times, Mr. Stone told Mr. Rainwater that he was unable to accept the flock.  The plaintiffs cannot now claim that Koch breached its duty to provide them with flocks.  The plaintiffs have not produced evidence sufficient to support a finding that Koch

breached the contract. Because this is an essential element to their claim, the motion for summary judgment will be granted.

## IV. Conclusion

For these reasons, the court concludes that the plaintiffs' Motion to Strike will be denied, the defendant's Motion for Summary Judgment will be granted, and the defendant's Motion to Strike will be denied as moot.

This the 18th day of February 2014.

_____
ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE